# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA M. GOSHAY, | ) | |
| | ) | Civil Action No. 10-568 |
| Plaintiff | ) | |
| | ) | Judge Arthur J. Schwab |
| v. | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | ECF Nos. 9 and 15 |
| | ) | |
| Defendant | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### RECOMMENDATION

It is respectfully recommended that: the district court should grant Plaintiff's Motion for Summary Judgment, to the extent it seeks a remand for reconsideration by the ALJ, and deny said motion, to the extent it seeks judgment awarding benefits directly to Plaintiff; the district court should deny Defendant's Motion for Summary Judgment; and, the decision of the ALJ should be vacated and the case remanded for further proceedings.

### REPORT

**I.  BACKGROUND**

Donna M. Goshay ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 9, 15).

   *A. General*

Plaintiff was born August 10, 1961, and was forty six years of age at the time of the administrative hearing. (R. at 75)[1]. Plaintiff attended high school until the twelfth grade, but did not graduate. (R. at 272). Plaintiff's past employment included stints as a nurse's aide and dietary consultant. (R. at 127). Plaintiff was most recently employed to provide child care services for her grandchildren, averaging approximately nine hundred dollars per month. (R. at 40, 127). Plaintiff ceased providing care for her grandchildren in September of 2007. (R. at 41). At the time of the hearing, Plaintiff was living by herself. (R. at 44). Plaintiff was divorced from her husband of approximately eight years. (R. at 272). Plaintiff also had four children. (R. at 272).

   *B. Treatment History*

Plaintiff was admitted to Allegheny General Hospital for psychiatric care on November 2, 2005. (R. at 210). She exhibited symptoms of depression, and claimed that she had difficulty sleeping, had decreased appetite and resultant weight loss, felt hopeless and helpless, had been crying frequently, suffered decreased ability to concentrate, and was considering overdosing so she could die in her sleep. (R. at 210). Plaintiff described situational stressors such as her father's death, her mother's poor health, and her two sons' legal troubles. (R. at 210). Plaintiff stated that she had recently begun to drink more than usual – approximately three six packs of

---

[1] Citations to ECF Nos. 6 – 6-8, the Record, *hereinafter*, "R. at ___."

beer per week. (R. at 210). At admission, Plaintiff was diagnosed with major depressive disorder, and was given a global assessment of functioning[2] ("GAF") score of 25. (R. at 211).

Plaintiff was discharged from Allegheny General Hospital on November 8, 2005. (R. at 209). While admitted, Plaintiff was subject to therapeutic milieu, participated in group therapy sessions, was placed on prescription medications, and had a family meeting. (R. at 209). Hospital staff indicated that Plaintiff responded positively and found her treatment to be helpful. (R. at 209). By the date of discharge, Plaintiff exhibited a less depressed mood, congruent affect, and was cooperative. (R. at 209). Plaintiff was considered to be in good condition. (R. at 209). Her final diagnosis was major depressive disorder, and she was given a GAF score of 55. (R. at 209).

Plaintiff was referred to Mercy Behavioral Health for outpatient follow-up on November 14, 2005. (R. at 242). In an initial assessment, Plaintiff described the same symptoms complained of at Allegheny General Hospital. (R. at 237 – 49). Plaintiff added that she was the victim of spousal abuse. (R. at 242). Plaintiff also reported drinking socially three times per month. (R. at 237). Plaintiff was remarkable with respect to suicidal ideation. (R. at 239, 243, 248). Plaintiff exhibited psychomotor retardation, sad/ dysthymic mood, flat affect, flight of ideas, impaired concentration and ability to focus, some paranoid/ persecutory thoughts, and

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

feelings of hopelessness. (R. at 240 – 41). She was diagnosed with depression, and was given a GAF score of 43. (R. at 244 – 45). Plaintiff was found to require individual therapy and medication monitoring, and needed to learn healthy coping skills. (R. at 246 – 47). Plaintiff was treated at Mercy Behavioral Health on November 21 and December 6 of 2005, she continued to receive diagnoses of depression, and she was given GAF scores of 50 and 43, respectively. (R. at 253 – 58).

Plaintiff stopped receiving treatment at Mercy Behavioral Health because of a lack of insurance coverage. Upon receipt of adequate coverage, Plaintiff sought treatment again on January 22, 2007. (R. at 342 – 49). Plaintiff complained that she was isolating herself, was drinking heavily, had appetite and sleep disturbance, cried frequently, and had difficulty concentrating. (R. at 342). She also had contemplated suicide. (R. at 342 – 43). Plaintiff's environmental stressors, including her family, were relatively unchanged. (R. at 343). Plaintiff was diagnosed with adjustment disorder accompanied by depressed mood, and was given a GAF score of 47. (R. at 345). Medical notes indicated that Plaintiff had serious issues with medication and therapeutic compliance, coping skills, and alcohol abuse, all of which required immediate attention. (R. at 347).

A treatment progress report dated April 30, 2007, diagnosed Plaintiff with bipolar disorder, anxiety disorder, and alcohol dependence. (R. at 334). Plaintiff was given a GAF score of 43. (R. at 334). The report indicated that Plaintiff once drank a pint of alcohol following a traumatic experience. (R. at 334). The report also noted Plaintiff's continued suicidal ideation. (R. at 334). Plaintiff was depressed; she expressed chronic feelings of hopelessness, grief, and loss. (R. at 335).

On May 23, 2007, Plaintiff was admitted to Mercy Hospital at the recommendation of her psychiatrist, because of depression, anxiety, and suicidal thoughts. (R. at 299, 315). Plaintiff's mother had died several months prior, and the death was considered a contributing cause of Plaintiff's emotional state. (R. at 308). It was also determined that Plaintiff had recently been drinking a pint of alcohol and a six pack of beer three or four times a month. (R. at 299, 314). Plaintiff exhibited flat affect. (R. at 311). Plaintiff was diagnosed with depression and was given a GAF score of 25. (R. at 316).

A psychiatric evaluation of Plaintiff was conducted on May 24, 2007. (R. at 301). Plaintiff described the stress of her parents' deaths and her family's legal and other problems as the primary cause of her emotional state. (R. at 301). Plaintiff explained that she was drinking a fifth of alcohol and six pack of beer several times a week, and that this alcohol use was increasing. (R. at 301). She used the alcohol to escape her problems, but the following day tended to feel more depressed. (R. at 301). It was explained to Plaintiff that alcohol is a depressive agent. (R. at 301). Plaintiff was diagnosed with major depressive disorder, alcohol dependence, and post-traumatic stress disorder ("PTSD"). (R. at 302). She was given a GAF score of 30. (R. at 302).

Plaintiff was discharged from Mercy Hospital on May 25, 2007. (R. at 298). While at the hospital, Plaintiff's medications were increased, she participated in group and individual milieu therapy, and she was counseled to abstain from the use of alcohol. (R. at 298). Plaintiff's mood had improved, and she denied suicidal ideation at the time of discharge. (R. at 298). Her final diagnoses included major depressive disorder, alcohol abuse, and PTSD. (R. at 298). Her GAF score at discharge was 45. (R. at 298).

*C. Functional Limitations*

Plaintiff was assessed by Charles M. Cohen, Ph. D. on September 9, 2006 for the Pennsylvania Bureau of Disability Determination. (R. at 271). Dr. Cohen determined that Plaintiff was markedly limited with respect to interacting appropriately with the public, and understanding, remembering, and carrying out detailed instructions. (R. at 269). Plaintiff was otherwise only moderately limited. (R. at 269). Dr. Cohen diagnosed Plaintiff with adjustment disorder with depressed mood, and dysthymia. (R. at 273). He opined that while Plaintiff was chronically depressed, the depression was not so severe as to preclude all gainful employment. (R. at 273). Plaintiff was capable of reporting to work on-time, and could handle supervision and co-workers. (R. at 273). Inasmuch as Plaintiff's mood affected her ability to concentrate, she would be limited to only simple repetitive tasks, and her depressed mood would also limit her ability to work with the public. (R. at 273).

Dr. Cohen based his opinion upon an examination of Plaintiff. Plaintiff reported a number of situational factors – including her husband, children, and parents – as the causes of on-going depression. (R. at 271). At the time, Plaintiff had only limited mental health resources, because her insurance would not cover treatment and she could not afford prescription medications. (R. at 271). Plaintiff complained that she cried frequently and had difficulty concentrating and managing stress. (R. at 272 – 73). Plaintiff did not exhibit behavioral abnormalities, but appeared mildly depressed and had mildly blunted affect. (R. at 272). Vague suicidal ideation was noted in Plaintiff's past, though Plaintiff claimed she was not experiencing suicidal thoughts at the time of the assessment. (R. at 272). Plaintiff exhibited average reasoning capabilities. (R. at 272).

On September 21, 2006, Roger Glover, Ph. D. performed a residual functional capacity ("RFC") assessment of Plaintiff for the Social Security Administration. (R. at 275 – 91). Plaintiff was found to exhibit no marked limitations in her functional capacity. (R. at 275 – 76). Dr. Glover concluded that Plaintiff could be expected to complete a normal workweek without significant psychological effects. (R. at 277). Plaintiff was diagnosed with an adjustment disorder. (R. at 277). Dr. Glover considered Dr. Cohen's earlier assessment to be an overestimation of Plaintiff's true limitations, because the objective medical record was inconsistent with Dr. Cohen's conclusions, and because Dr. Cohen relied too heavily upon Plaintiff's subjective complaints. (R. at 277). Dr. Glover did not cite specifically to any medical records as support for his conclusion. (R. at 277).

Plaintiff's psychiatrist, Daniel Monti, M.D. assessed Plaintiff's psychological state and functional limitations on July 27, 2007. (R. at 319 – 28). Dr. Monti had been treating Plaintiff since her return to Mercy Behavioral Health, seeing her once weekly on an outpatient basis since June 5, 2007, and during a partial hospitalization program from June 7, 2007 until June 19, 2007. (R. at 313, 319). Plaintiff was diagnosed with major depressive disorder and PTSD. (R. at 319). Plaintiff was given a GAF score of 30. (R. at 319). Dr. Monti noted that Plaintiff exhibited psychomotor retardation, depressed mood, sad/ flat affect, passive – sometimes suicidal – death wishes, and difficulty with concentration. (R. at 320). Plaintiff had fair impulse control, but was found to use alcohol to treat her feelings of anxiety. (R. at 321). Dr. Monti did not indicate that Plaintiff abused alcohol, however. (R. at 321).

Dr. Monti concluded that Plaintiff was markedly limited in the following areas: ability to understand and remember simple and detailed instructions, and work procedures; ability to respond appropriately to supervision and co-workers; ability to perform on the job without

7

inordinate supervision; ability to function independently on the job and exercise appropriate judgment and make simple work-related decisions; ability to complete a normal workday, and concentrate/ attend to tasks over a full eight hours without interruptions from psychologically-based symptoms; ability to perform routine tasks and maintain continuous performance/ expected production levels without unreasonable rest periods; ability to complete sequential tasks; ability to work without frequent absences; ability to work according to a schedule; ability to abide by occupational rules/ regulations; ability to make social adjustments and get along with others; ability to use public transit; ability to comprehend everyday hazards and avoid such hazards; and, ability to tolerate customary work pressures. (R. at 322 – 28). Dr. Monti indicated that Plaintiff's psychological state would deteriorate if placed under the stress of employment, and that deterioration related to stress had occurred for Plaintiff in the past. (R. at 328).

*D. Administrative Hearing*

At the hearing held October 17, 2007, Plaintiff explained that her psychological problems did not appear until after the death of her father three years prior to the hearing. (R. at 46). Her mother's passing approximately one year prior to the hearing further exacerbated her psychological distress. (R. at 46). Until a short time before her mother's death, Plaintiff lived with and provided her with limited care. (R. at 46 – 47). Plaintiff's mother received hospice care once she became unable to care for herself, whatsoever. (R. at 50). The burden of caring for her parents and their subsequent deaths was emotionally devastating for Plaintiff. (R. at 53 – 54). Additionally, following her mother's passing, Plaintiff began providing one of her brothers with help around the house and with picking up groceries, as a result of health problems and a dependence on oxygen. (R. at 47).

8

Plaintiff testified that she was plagued by depression every day. (R. at 54). She had no desire to engage in any activities, and had suicidal thoughts. (R. at 54). Plaintiff avoided traveling by herself, even for doctor's appointments and grocery shopping. (R. at 46, 48). Plaintiff could not concentrate long enough to finish reading a book. (R. at 46). Plaintiff testified that she was taking the prescription medications Effexor, Trazadone, and Geodon for her psychological issues. (R. at 45). Plaintiff claimed that her medications made her sleepy, but that she had difficulty sleeping for extended periods. (R. at 45). Plaintiff testified that she was compliant with her prescription regimen. (R. at 54). Plaintiff was able to provide day-time care for three of her grandchildren for six to eight hours a day until approximately August of 2007, when her emotional state forced her daughter to make other child-care arrangements. (R. at 49, 51 – 53).

Plaintiff testified regarding a partial hospitalization program she underwent with Dr. Monti following an admission to Mercy Hospital in May of 2007. (R. at 43, 52). Plaintiff had originally been admitted to Mercy Hospital on the recommendation of Dr. Monti because of deep depression. (R. at 52). At that time, she was also diagnosed with PTSD. (R. at 53). Plaintiff explained that she attended the partial hospitalization program at Saint Margaret's Hospital five days a week, from 10:00 a.m. until 3:00 p.m. (R. at 43). She was participating in the program as a result of depression and admittedly heavy drinking – almost a fifth of liquor was being consumed two to three times a week, frequently causing Plaintiff to become sick and/ or unable to remember events of the previous day. (R. at 43). However, Plaintiff explained that – against the recommendations of Dr. Monti – she was not involved in a treatment program specific to alcohol use. (R. at 54).

Following Plaintiff's testimony, the administrative law judge ("ALJ") questioned the vocational expert regarding what jobs may be available in significant numbers in the national economy to a hypothetical person of the same age, education, and work experience as Plaintiff, with the following limitations: the workload must be simple and repetitive in nature, and require no interaction with the general public or close interaction or cooperation with co-workers. (R. at 56). The vocational expert testified that, amongst other possibilities, the following jobs would be available to the hypothetical person: light exertional "cleaner, housekeeping/ cleaning," with 400,000 positions available in the national economy; light exertional "assembly," with 715,000 positions available; light exertional "laundry," with 71,000 positions; and light exertional "pressing machine operator," with 114,000 positions. (R. at 56).

Plaintiff's attorney followed-up by asking the vocational expert what jobs would be available if the hypothetical person would also miss at least two days of work per month, and be off-task ten to fifteen percent of each workday. (R. at 57). The vocational expert stated that it is unlikely that any jobs would be available to such a person. (R. at 57).

## II. ANALYSIS

*A. Standard of Review*

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[3] and 1383(c)(3)[4]. Section 405(g) permits a district court to review

---

[3]
    Section 405(g) provides in pertinent part:
        Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

transcripts and records upon which a determination of the Commissioner is based. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[4]

    Section 1383(c)(3) provides in pertinent part:
        The final determination of the Commissioner of Social Security after a hearing under paragraph
        (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent
        as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

*B. Discussion*

The ALJ determined that Plaintiff suffered from severe impairment by way of major depression and alcohol dependence. (R. at 14). Plaintiff was determined to be unable to engage in substantial gainful activity because she was limited to simple, repetitive tasks not involving dealing with the general public or maintaining close interaction with co-workers. (R. at 16 – 17). Further, she would miss more than two days per month due to marked restriction in the ability to cope with work stress, and she would be unable to stay on task for ten to fifteen percent of a workday. (R. at 16 – 17). However, the ALJ concluded Plaintiff was not disabled for purposes

of DIB or SSI, because her alcohol abuse was a contributing factor material to the finding of disability. (R. at 18 – 21). The ALJ found that if Plaintiff had not been abusing alcohol, certain marked restrictions in her functioning – specifically, her absenteeism and inability to stay on-task – would be removed, and her remaining limitations would not prevent her from engaging in substantial gainful activity. (R. at 18 – 21).

Plaintiff objects to the ALJ's determination in several respects. Plaintiff claims that the ALJ erred when finding that her abuse of alcohol was material to her disability determination. (Doc. No. 10 at 6). Allegedly, there was no objective medical evidence that supported the ALJ's conclusion that absent alcohol abuse, Plaintiff would not be off-task at work or absent two or more days a month. (Doc. No. 10 at 6). The ALJ arguably bore the burden of proving that without the abuse of alcohol, Plaintiff would not have been disabled. (*Id.*). Plaintiff asserts that the ALJ failed to carry his burden, and that according to Social Security Administration emergency teletype EM-96200, she should reap the benefit of any ambiguity absent a clear showing of materiality. (*Id.*).

Defendant counters that the objective evidence found in the record showed that Plaintiff's psychological functioning only deteriorated to the point of disability when she was abusing alcohol. (Doc. No. 16 at 11 – 14). Otherwise, medical professionals observing her condition did not find any functional limitations that, alone or in combination, prevented Plaintiff from engaging in substantial gainful activity. (*Id.*). As a result, substantial evidence supported the ALJ's conclusion that when not abusing alcohol, Plaintiff was not disabled, and therefore, was not entitled to DIB or SSI. (*Id.*).

The Act states that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's

determination that the individual is disabled." *Ambrosini v. Astrue*, --- F. Supp.2d ---, 2010 WL 2926216 at *11 (W.D.Pa. 2010) (quoting 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)). According to 20 C.F.R. §§ 404.1535 and 416.935, the 'key factor' in making the above conclusion is determining whether a claimant would continue to be disabled if they ceased to use drugs and/ or alcohol. This requires the ALJ to complete a four step process: first, the ALJ must consider all of the claimant's limitations and use the usual five step analysis to determine if the claimant is disabled; second, the ALJ must determine whether there is medical evidence of drug or alcohol abuse; third, the ALJ must identify which of the claimant's limitations would remain if alcohol or drug use ceased; and fourth, the ALJ would need to repeat the usual five step analysis to determine if the claimant would continue to be disabled with his or her remaining limitations. *Nomes v. Astrue*, 155 Soc. Sec. Rep. Serv. 860, 2010 WL 3155507 at * 7 – 8 (W.D.Pa. 2010) (quoting *Warren v. Barnhart*, 2005 WL 1491012 at *10 (E.D.Pa. 2005).

As with all social security determinations, the ALJ must provide substantial evidence to justify his findings. "Courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review." *Cotter v. Harris*, 642 F.2d 700, 705 . 7 (3d Cir. 1981) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ cannot reject probative evidence for "no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). A decision should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). Such is not the case at present.

In his decision, the ALJ clearly attributed Plaintiff's alleged inability to stay on task for ten to fifteen percent of each workday, as well as her likely absence from work two or more days

per month, to her alcohol use. (R. at 15 – 21). To support this conclusion, the ALJ states – without reference to any findings on the record – that Plaintiff's alcohol use would clearly preclude Plaintiff from maintaining concentration and focus, and that drinking until intoxicated would prevent Plaintiff from attending work regularly. (R. at 15). The ALJ similarly concluded that if Plaintiff had not been using alcohol, she would not have experienced decompensation in the form of hospitalization. (R. at 15, 18). The ALJ attempted to support this finding with evidence from the record showing that Plaintiff had been instructed to avoid alcohol following her second hospitalization. (R. at 20). She had been informed that alcohol was a depressive agent and it could exacerbate her depressed condition. (R. at 20). Yet, the ALJ failed to provide objective evidence indicating that absent alcohol use, Plaintiff would not have been hospitalized.

"[A] materiality finding must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work." *Ambrosini*, 2010 WL 2926216 at *12 (citing *Sklenar v. Barnhart*, 195 F.Supp.2d 696, 699 – 706 (W.D.Pa. 2002)). "While the evidence supporting a finding of materiality need not come in the form of expert psychiatric opinion evidence, it must be sufficiently probative to constitute 'substantial evidence' within the meaning of § 405(g)." *Id.* (citing *McGill v. Commissioner of Social Security*, 288 Fed. Appx. 50, 53 (3d. Cir. 2008)).

Similar to the court's finding in *Ambrosini*, the ALJ here failed to provide substantial evidence of materiality when he did not cite objective support from the record indicating that Plaintiff's alcohol use and other mental impairments were distinct and had distinct effects. *Id.* at *13. It is notable that Plaintiff was imbibing several six packs of beer a week prior to her first hospitalization and assessments by Dr. Cohen and Dr. Glover, and yet no causal connection was established by these doctors, or any other objective source, indicating Plaintiff's condition

15

deteriorated only because her use of alcohol increased. (R. at 210). In fact, the record is replete with evidence indicating that her family situation was also worsening as her mental condition deteriorated, which could just as easily explain Plaintiff's problems. By the time of her hearing, Plaintiff had lost both parents – one of whom she had provided with extensive care, Plaintiff's sick brother was relying upon her for care, Plaintiff had divorced her abusive, alcoholic husband, Plaintiff's two sons were having significant legal issues, and one of Plaintiff's daughters was a victim of abuse by a boyfriend. (R. at 242 – 43, 272, 301 – 02). Plaintiff's social environment was always listed as a factor precipitating her hospitalizations, and no objective source ever attempted to disentwine Plaintiff's alcohol use from her other impairments when determining limitations. In light of this, the ALJ's conclusions appear to have been medical opinions he was not qualified to make. *Id.* This is not substantial evidence. *Id.*

The court must next consider three functional assessments that were conducted in Plaintiff's case, and the ALJ's attempt to rely upon Dr. Cohen's and Dr. Glover's as further support for his finding that Plaintiff's alcohol use was material to her disability. (R. at 20). In so doing, the ALJ disregarded a third, conflicting functional assessment conducted by Plaintiff's treating psychiatrist, Dr. Monti, because he merely "submitted a check block form" indicating Plaintiff had marked limitations in most areas of functioning. (R. at 6).

The Court of Appeals for the Third Circuit has held that treating physicians' opinions may be entitled to great weight - considered conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physicians' findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). It is

expected that when rejecting a treating physician's findings or according such findings less weight, the ALJ will be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Moreover, the ALJ "should not substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). The ALJ's rejection of Dr. Monti's assessment did not meet this standard.

Dr. Monti had an established history of treatment of Plaintiff. (R. at 14, 16, 20, 307, 313, 315, 319 – 28). Accompanying his assessment of Plaintiff's limitations was a narrative of evidence he considered when coming to his conclusions. (319 – 21). Almost none of his limitations findings were discussed, and no evidence was presented by the ALJ to refute these findings. More importantly, unlike Dr. Monti's assessment, Dr. Cohen and Dr. Glover's assessments were completed over a year prior to the hearing and could not account for any of Plaintiff's problems following those assessments – including a full hospitalization, partial hospitalization, and continuing family-related issues. (R. at 269 – 91). Further, both Dr. Cohen and Dr. Glover's assessments closely resembled Dr. Monti's "check block form," and Dr. Glover's appeared to be even less comprehensive than Dr. Monti's or Dr. Cohen's. (R. at 269 – 91). Dr. Cohen observed Plaintiff on only one occasion, and there is no evidence that Dr. Glover ever met Plaintiff. (R. at 269 – 91). In light of these facts, the court will not find that the ALJ's RFC could constitute substantial evidence, when the ALJ's failure to properly discuss Dr.

17

Monti's assessment makes it impossible to determine if the RFC truly reflects all of Plaintiff's credibly established limitations.

In sum, there is no objective evidence provided by the ALJ which shows that Plaintiff's alleged inability to maintain regular attendance or to stay on task is attributable only to her alcohol use, or that by ceasing such use, these limitations would disappear. The ALJ's personal suppositions regarding the effects of alcohol use and abuse on a person's ability to work are not sufficient to constitute substantial evidence. *Ambrosini*, 2010 WL 2926216 at *12 – 13. The law requires more. *Id.* Further, the ALJ's failure to adequately examine the extensive findings of Dr. Monti leads this court to conclude that the ALJ's RFC assessment was not reflective of Plaintiff's true limitations.

The court need not reach the merits of Plaintiff's other arguments that the ALJ did not properly adhere to EM-96200 regarding assessment of materiality of Plaintiff's alcohol abuse, and that EM-96200 should have been explicitly adopted. (Doc. No. at 5, 13). In this case, considering that the record was not fully and properly developed to begin with, the court cannot say whether EM-96200 was or was not applied correctly.

## III.    CONCLUSION

Based upon the foregoing, the ALJ failed to put forth sufficient objective facts from the record to support his RFC assessment of Plaintiff's functional limitations and his conclusion that her alcohol abuse was material to her disability determination, and therefore, she was not eligible for DIB or SSI. As a result, this court will not conclude that substantial evidence underlay the ALJ's decision. It is therefore recommended that the case be remanded in order that Dr. Monti's opinion may be properly considered, and to develop the record more fully in order to conclude

that objective evidence indicated that abstaining from alcohol abuse would render Plaintiff capable of engaging in substantial gainful activity. "On remand, the ALJ shall fully develop the record and explain his findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Commissioner of the Social Security Administration*, --- F.3d ---, 2010 WL 4643844 at *2 (3d Cir. 2010). *See also Ambrosini*, 2010 WL 2926216 at *15. Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at *3 n. 2.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

December 7, 2010

                                                      Lisa Pupo Lenihan
                                                      United States Magistrate Judge

cc/ecf: All counsel of record.